APPEAL NUMBER 19-1314

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,

V.

SANDRO ZHININ,
Appellant

---

BRIEF FOR APPELLANT

---

Appeal from Judgment in a Criminal Case Entered on
February 1, 2019, in the United States District Court for the Eastern
District of Pennsylvania, at Criminal Number 17-cr-383
by the Honorable Edward G. Smith

---

ROBERT EPSTEIN
Assistant Federal Defender

BRETT G. SWEITZER
Assistant Federal Defender
Chief of Appeals

LEIGH M. SKIPPER
Chief Federal Defender

Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 540 West - Curtis Center
601 Walnut Street
Philadelphia, PA  19106
(215) 928-1100

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ...................................................................................iv

Statement of Subject Matter and Appellate Jurisdiction ...........................1

Statement of Related Cases and Proceedings ...........................................2

Statement of the Issues................................................................................3
    Preservation of the Issue ...................................................................3

Statement of the Case.................................................................................5

    A.     Overview ...................................................................................5

    B.     Course of Proceedings..........................................................7

    C.     The offense conduct ..............................................................8

    D.     Mr. Zhinin's background and history ..................................10

    E.     The calculation of Mr. Zhinin's Guidelines Sentencing
            range.......................................................................................11

    F.     Mr. Zhinin's sentencing memorandum and request for a
            variance .................................................................................12

    G.     Dr. Dattilio's report.............................................................13

    H.     The government's response and Mr. Zhinin's reply...........15

    I.     The sentencing hearing.......................................................16

    J.     The district court's sentencing explanation........................18

    K.     Defense counsel's objection ................................................20

Summary of the Argument.........................................................................21

i

# **TABLE OF CONTENTS (continued)**

PAGE

Argument....................................................................................................25

                                     I.
            The district court judge committed procedural error in sentencing Mr.
            Zhinin, a first time offender, to a life term of imprisonment where the
            judge:
            1) acknowledged Mr. Zhinin's unwarranted disparity argument as
            being "very powerful," but failed to then respond to it, or to find that
            Mr. Zhinin's life sentence did not create unwarranted disparity with
            the thirty other defendants defense counsel specifically pointed to;
            2) acknowledged, but failed to respond to the report and testing of the
            forensic psychologist who evaluated Mr. Zhinin and concluded that he
            is not a sociopath, is "amenable to treatment," and is "at a very low
            risk to reoffend;" and
            3) explained his imposition of a life sentence by stating his personal
            belief that "there is an evilness that lurks within [Mr. Zhinin] . . . . an
            unmitigable evilness" that would make Mr. Zhinin "likely to commit
            another offense" should he ever be released from prison, no matter
            how advanced his age...........................................................................25

Standard of Review.......................................................................................25
Discussion ...................................................................................................26

A.    At sentencing, the district court must articulate on the record
       an acknowledgement and response to the parties' arguments............29

B.    Sentencing determinations must be based on reliable evidence –
       unsupported assumptions regarding recidivism are impermissible....33

C.    The district court failed to acknowledge and respond to Mr.
       Zhinin's non-frivolous sentencing arguments ...................................34

D.    The district court's rationale for imposing a life sentence was
       improper ...........................................................................................42

ii

# TABLE OF CONTENTS (continued)

**PAGE**

II.
Mr. Zhinin's sentence of life imprisonment is substantively
unreasonable given that the court's primary basis for it – the court's
unsubstantiated speculation that Mr. Zhinin, a first time offender,
would still be a "likely" recidivist even after serving a thirty-year
mandatory minimum sentence because of the "unmitigable evil"
lurking within him – was improper and one which no reasonable
sentencing court would adopt. ...........................................................46

Standard of Review.......................................................................46
Discussion ...................................................................................47

Conclusion ...........................................................................................49

Joint Appendix – Volume I (App. 1 – X)

Certificate of Bar Membership

Certification

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**PAGE(S)**

## FEDERAL CASES

*Rita v. United States*,
  551 U.S. 338 (2007) ........................................................................30

*United States v. Ausburn*,
  502 F.3d 312 (3d Cir. 2007) ......................................................*passim*

*United States v. Begin*,
  696 F.3d 405 (3d Cir. 2012) ..........................................21, 30, 32, 38

*United States v. Bradley*,
  628 F.3d 394 (7th Cir. 2010) ..........................................................33

*United States v. Cossey*,
  632 F.3d 82 (2d Cir. 2010) ........................................................*passim*

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010) ............................................................26

*United States v. England*,
  555 F.3d 616 (7th Cir. 2009) ..........................................................33

*United States v. Flores-Mejia*,
  759 F.3d 253 (3d Cir. 2014) ............................................ 20, 25, 30-31

*United States v. Friedman*,
  658 F.3d 342 (3d Cir. 2011) ......................................................30, 32

*United States v. Goff*,
  501 F.3d 250 (3d Cir. 2007) ......................................................32, 46

*United States v. Griess*,
  971 F.2d 1368 (6th Cir. 1992) ...................................................... 33-34

*United States v. Grober*,
  624 F.3d 592 (3d Cir. 2010) ............................................................26

# TABLE OF AUTHORITIES (continued)

**PAGE(S)**

*United States v. Gunter*,
    462 F.3d 237 (3d Cir. 2006)............................................................29

*United States v. Jackson*,
    467 F.3d 834 (3d Cir. 2006)......................................................31, 39

*United States v. Levinson*,
    543 F.3d 190 (3d Cir. 2008)............................................................31

*United States v. Lychock*,
    578 F.3d 214 (3d Cir. 2009)............................................................32

*United States v. Merced*,
    603 F.3d 203 (3d Cir. 2010)......................................................*passim*

*United States v. Olhovsky*,
    562 F.3d 530 (3d Cir. 2009)......................................................*passim*

*United States v. Tomko*,
    562 F.3d 558 (3d Cir. 2009) (en banc) ..................................23, 46, 48

*United States v. Zabielski*,
    711 F.3d 381 (3d Cir. 2013)............................................................33

## FEDERAL STATUTES

18 U.S.C. § 2241 ............................................................................7

18 U.S.C. § 2423(b) ........................................................................7

18 U.S.C. § 2251 ............................................................................7

18 U.S.C. § 2252 ............................................................................7

18 U.S.C. § 3553............................................................................29, 34

18 U.S.C. § 3742(a) ........................................................................1

# TABLE OF AUTHORITIES (continued)

PAGE(S)

28 U.S.C. § 1291 ..................................................................................1

**SENTENCING GUIDELINES**

U.S.S.G. § 2A3.1....................................................................................11

U.S.S.G. § 2G2.1....................................................................................12

**OTHER**

United States Sentencing Commission, 2018 Sourcebook
  of Federal Sentencing Statistics ........................................................26

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This case commenced with the prosecution of appellant, Sandro Zhinin, for alleged violations of the laws of the United States.  District courts have original jurisdiction over such prosecutions pursuant to 18 U.S.C. § 3231.  Upon conviction, Mr. Zhinin was sentenced to a term of life imprisonment, lifetime supervised release, and a special assessment of $500.00.  (App. 3-9).[1]

This is an appeal of the district court's judgment entered on February 1, 2019.  This Court has jurisdiction under 28 U.S.C. § 1291, as an appeal from a final decision of a district court, and, more specifically, under 18 U.S.C. § 3742(a), as an appeal of a sentence imposed under the Sentencing Reform Act of 1984.  A notice of appeal was timely filed on February 4, 2019, pursuant to Federal Rule of Appellate Procedure 4(b)(1)(A)(I).  (App. 1).

---

[1] "App." followed by a number denotes the relevant page of the appendix to the brief.  Volume I of the appendix is bound with this brief pursuant to Local Appellate Rule 32.2(c), the Presentence Report has been filed separately under seal.

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

The instant case has not been before this Court previously, and counsel knows of no other case or proceeding that is in any way related that has been completed, is pending or is about to be presented before this Court.

## STATEMENT OF THE ISSUES

### I.

**Whether the district court judge committed procedural error in sentencing Mr. Zhinin, a first time offender, to a life term of imprisonment where the judge:**

> **1) acknowledged Mr. Zhinin's unwarranted disparity argument as being "very powerful," but failed to actually then respond to it, or to find that Mr. Zhinin's life sentence did not create unwarranted disparity with the thirty other defendants defense counsel specifically pointed to;**

> **2) acknowledged, but failed to respond to the report and testing of the forensic psychologist who evaluated Mr. Zhinin and concluded that he is not a sociopath, is "amenable to treatment," and is "at a very low risk to reoffend;" and**

> **3) explained his imposition of a life sentence by stating his personal belief that "there is an evilness which lurks within [Mr. Zhinin] . . . . an unmitigable evilness" that would make Mr. Zhinin "likely to commit another offense" should he ever be released from prison, no matter how advanced his age?**

### Preservation of the issue

Defense counsel preserved the first two prongs of this issue by objecting after the imposition of sentence to the district court's failure to meaningfully consider Mr. Zhinin's arguments in mitigation. Defense counsel, however, did not object to the third prong of this issue, concerning the court's improper reliance on its belief that Mr. Zhinin is possessed by "unmitigable evil" and the court's speculation that this evil would "likely" cause Mr. Zhinin to recidivate even during the latter years of his life.

## II.

**Whether Mr. Zhinin's sentence of life imprisonment is substantively unreasonable given that the court's primary basis for it – the court's unsubstantiated speculation that Mr. Zhinin, a first time offender, would still be a "likely" recidivist even after serving a thirty-year mandatory minimum sentence because of the "unmitigable evil" lurking within him – was improper and one which no reasonable sentencing court would adopt?**

### Preservation of the Issue

This issue was preserved by defense counsel's argument that the court should sentence Mr. Zhinin to the thirty-year mandatory minimum sentence and that anything over that would be unreasonable.

## STATEMENT OF THE CASE

A.    Overview

As this Court has seen in prior cases, a disturbing offense has, in turn, led to a problematical sentence.  The appellant Sandro Zhinin twice engaged in sexual relations with a minor who he met on an internet dating site.  Presentence Report ("PSR") at ¶¶ 19-21.  Mr. Zhinin was thirty-three at the time.  *Id*. at ¶ 19.  The minor was only eleven and a half, and, although she appeared to be considerably older, Mr. Zhinin, in pleading guilty, admitted that he knew she was underage. (App. 161-62).  Mr. Zhinin, who has no prior contacts with the criminal justice system, did not employ force or coercion.  (App. 65).  The minor willingly participated, although her ostensible consent was obviously invalid.  As Mr. Zhinin acknowledged at the time of sentencing, his criminal conduct was reprehensible and he ultimately caused the minor and her family anguish and pain, for which he has only himself to blame.  (App. 110).

After pleading guilty to charges brought by the Commonwealth of Pennsylvania and receiving a sentence of 20-40 years of imprisonment, Mr. Zhinin was then charged by the federal government with aggravated sexual assault of a minor, an offense carrying a mandatory minimum of thirty years.  (App. 129).  In addition, he was charged with the production of child pornography, a charge which stemmed from his recording the second encounter with the minor on his tablet.

5

PSR at ¶ 24.  The production count had the effect of raising his advisory Guidelines Sentencing range from 292-365 months to life.  *Id*. at ¶ 106.

Mr. Zhinin's attorney advocated for a downward variance and a sentence of the thirty-year mandatory minimum.  (App. 132-37).  Pointing to the statutory sentencing factor of avoiding unwarranted sentencing disparity, defense counsel submitted a chart of thirty other cases in which defendants had committed either comparable or worse offenses than Mr. Zhinin's and received sentences of less than life.  (App. 160; 164-184).  In addition, counsel submitted the report and testing of a forensic psychologist, Frank M. Dattilio, Ph.D, who after interviewing Mr. Zhinin and administering no less than ten forms of psychological testing, concluded that Mr. Zhinin, though suffering from a "significant personality dysfunction," is not a sociopath or psychopath, is "amenable to treatment," and is "at a very low risk to reoffend."  (App. 155-57).

The district court, in imposing a life sentence, acknowledged that defense counsel had made a "very powerful" unwarranted disparity argument, (App. 113), but the court never actually went on to respond to that argument.  The court thus never found that Mr. Zhinin's life sentence did not create an unwarranted disparity with the other defendants that counsel had pointed to.  Similarly, while the court stated that it had "considered . . . carefully" Dr. Dattilio's report, (App. 113), the court never responded to that either.  Instead, the court relied upon its own belief

6

that there is an "evilness that lurks within" Mr. Zhinin, an "unmitigable evilness within [him]," making it "likely" that he would commit crimes if he was ever released from prison, no matter how advanced his age. (App. 118, 120). It was precisely because of this view that the district court imposed a life sentence, so that Mr. Zhinin would never have the opportunity, even near the end of his life, to commit another crime. (App. 120). The issues on this appeal are whether the district court's sentence was procedurally and substantively sound.

B.    Course of Proceedings

On July 20, 2017, an eight-count indictment was returned in the U.S. District Court for the Eastern District of Pennsylvania charging Mr. Zhinin with aggravated sexual assault of a minor, in violation of 18 U.S.C. § 2241(c) [Counts 1 through 3], travel with the intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) [Counts 4 through 6], production of child pornography, in violation of 18 U.S.C. § 2251 [Count 7], and possession of child pornography, in violation of 18 U.S.C. § 2252 (a)(4)(B) [Count 8]. (App. 18-25).

On August 8, 2018, Mr. Zhinin pleaded guilty to Counts 1, 2, 3, 7, and 8, before the Honorable Edward G. Smith. PSR at ¶ 2. Counts 4, 5, and 6 of the Indictment were subsequently dismissed. On February 1, 2019, Mr. Zhinin was sentenced by Judge Smith to life imprisonment to be served concurrently with Mr. Zhinin's state sentence. (App. 121). The court also imposed a lifetime term of

7

supervised release and a special assessment of $500.  (App. 121).  A timely notice

of appeal was filed on February 4, 2019.  (App. 1).

C.    The offense conduct

In early March of 2017, Mr. Zhinin began communicating with the minor

through the website "meet me."  PSR at ¶ 19.  After communicating further via

"Skype" and "Snapchat," they met in person on March 4th,  at a park in

Northampton, Pennsylvania.  *Id*. at ¶¶ 17, 19.  They then went to the Red Roof Inn

in Hanover Township, where they engaged in sexual intercourse.  *Id*. at ¶ 20.[2]

A week later, on March 11th, they met again at the same park.  *Id*. at ¶ 21.

This time they went to the Scottish Inn in Hanover Township, where they again

had intercourse.  *Id*.  Mr. Zhinin recorded the act on his tablet, which was

subsequently recovered by the police.  *Id*. at ¶ 24.  As the recording reveals, Mr.

Zhinin was not physically forceful with the minor, a fact which the government

stipulated to at sentencing.  (App. 65).  Nor is there any "indication" in the video

that the minor "was in any type of pain or was resistant or complaining . . . ."

(App. 156).

As the video also shows, the minor had the physical appearance of someone

much older.  (App. 156).  Nevertheless, as Mr. Zhinin acknowledged when

---

[2] According to the minor, Mr. Zhinin initially represented himself to be sixteen
and then later said that he was nineteen.  *Id*. at ¶ 19.

pleading guilty in both state and federal court, he knew that the minor was underage. (App. 161-62).

Upon returning home after her second encounter with Mr. Zhinin, the minor was confronted by her parents who had filed a missing person's report with the police when they were unable to reach her. PSR at ¶ 17. The minor then told her parents and the police about her relationship with Mr. Zhinin. *Id.*

Under supervision by the police, the minor arranged a meeting with Mr. Zhinin for March 25, 2017, at the same park where they had previously met. *Id.* at ¶¶ 22, 23. When Mr. Zhinin was subsequently observed at the park, he was arrested and taken into custody. *Id.* at ¶ 23. He was found to be in possession of a hotel keycard for the Red Roof Inn in Hanover Township where he had just checked in. *Id.*

Mr. Zhinin's hotel room was subsequently searched. *Id.* at ¶ 24. There, the police recovered Mr. Zhinin's tablet. *Id.* No child pornography was found on the tablet beyond the above mentioned video of Mr. Zhinin and the minor. Nor was child pornography found on any other device belonging to Mr. Zhinin.[3]

---

[3] The police did discover that Mr. Zhinin had engaged in on-line chats with two other minors, though there was no evidence that he ever met either of them, or any other minor besides the victim in this case. *Id.* at ¶ 25.

D.    Mr. Zhinin's background and history

An examination of Mr. Zhinin's personal history reveals how incredibly aberrant the instant offenses were.  Mr. Zhinin is the oldest of five children born to Ecuadorian immigrants who came to the United States when Mr. Zhinin was two years old.  PSR at ¶¶ 78, 81.  Mr. Zhinin's father worked as a landscaper, his mother as a home health aide.  *Id*. at 78.  They raised Mr. Zhinin and his younger siblings in Sleepy Hollow, New York where they stressed education, hard work and their Roman Catholic faith.  *Id*. at ¶¶ 80, 82.

Mr. Zhinin graduated from Sleepy Hollow High School in 2001.  *Id*. at ¶ 97.  He then began working various part-time jobs and attending college at the City University of New York – Baruch College, from where he eventually earned a Bachelor of Arts degree in 2009.  *Id*. at ¶ 98; (App. 148).

After graduating from college, Mr. Zhinin worked in New York City for ten years as a database manager for the Outdoor Sports Group.  *Id*. at ¶ 100.  At the time of the instant offenses, he was employed by "Real Match," a technology company in New York.  *Id*. at ¶ 99.

Mr. Zhinin has never before been in trouble with the law.  He has no juvenile record and no prior contacts with the criminal justice system.  *Id*. at ¶¶ 72-76.  Throughout his adult years, living in New York City, Mr. Zhinin dated and had several romantic relationships with age-appropriate woman.  (App. 149-50).

Prior to this case, Mr. Zhinin never had inappropriate contact with a minor. As his parents and siblings testified at the sentencing hearing, they were all completely shocked by his commission of the instant offenses. (App. 75, 77, 80).

E.      The calculation of Mr. Zhinin's Guidelines Sentencing range

The offenses of conviction in this case were divided into four different groups, the first three of which were for the three counts of aggravated sexual assault of a minor.[4] The base offense level for each of these three groups was 38, pursuant to U.S.S.G. § 2A3.1(a)(1). PSR at ¶¶ 35, 41, 47. Two levels were added because of the use of a computer, *Id*. at ¶¶ 36, 42 and 48, making the final adjusted offense level for these three groups 40. *Id*. at ¶¶ 40, 46, 52. Accordingly, had the sentencing range been calculated for just these three offenses alone, the final combined offense level, after adding a multiple group adjustment of three levels, and subtracting three levels for acceptance of responsibility, would have been 40, which combined with Mr. Zhinin's criminal history category of I, would have produced a range of 292-365 months.[5]

---

[4] The last of these counts related to Mr. Zhinin's unsuccessful attempt to meet the minor on the day he was arrested.

[5] This range would have been substantially lower had the minor been a few months older. If she had reached the age of twelve, the final adjusted offense level for these offenses would have been 34, producing a range of 151-188 months. *See* §§ 2A3.1(a)(2), (b)(2), (b)(6).

11

Driving the range up substantially higher, however, was Mr. Zhinin's convictions for the production and possession of child pornography, convictions which stemmed only from the video that he took of his second sexual encounter with the minor, a video that Mr. Zhinin never disseminated and never had any intention of disseminating.[6]  Mr. Zhinin's base offense level for these two offenses was thirty-two, under U.S.S.G. § 2G2.1(a), but he received twelve-levels of enhancements[7], bringing his final offense level to forty-four.  PSR at ¶¶ 53-61. Four-levels were then added for a multiple count adjustment, *Id*. at ¶ 64, and three-levels subtracted for acceptance of responsibility, making the final adjusted offense level forty-five.  *Id*. at ¶¶ 64-68.  The final advisory Guidelines range was thus life imprisonment.  *Id*. at ¶ 106.

F.      Mr. Zhinin's sentencing memorandum and request for a variance

Mr. Zhinin's counsel submitted a sentencing memorandum requesting a downward variance to the thirty-year mandatory minimum required by the sexual assault counts.  (App. 132-37).  In support of this request, defense counsel

---

[6] Mr. Zhinin was not a collector of child pornography.  As discussed above, not a single image of child pornography was found on any of his devices beyond the one video in question.

[7] Four levels because of the minor's age, U.S.S.G. § 2G2.1(b)(1)(A); two levels because the offense involved a sexual act, U.S.S.G. § 2G2.1(b)(2)(A); four levels because the offense involved sadistic or masochistic acts, U.S.S.G. § 2G2.1(b)(4); and two levels for use of a computer, U.S.S.G. § 2G2.1(b)(6).  PSR at ¶¶ 54-57.

submitted a "Psychological Evaluation and Sexual Risk Assessment" of a forensic and clinical psychologist, Dr. Frank Dattilio, who evaluated Mr. Zhinin by conducting two clinical interviews and a battery of tests. (App. 143-58). Defense counsel also submitted a supplemental memorandum with a chart of thirty other cases from the Eastern District of Pennsylvania, involving defendants who were sentenced to less than life for offenses comparable to or more severe than Mr. Zhinin's. (App. 164-84).

In addition, defense counsel pointed to statistics showing that if Mr. Zhinin was given a thirty-year sentence, his life expectancy, after serving that much time in jail, would be approximately 70.6 years. (App. 160). Accordingly, the mandatory minimum sentence would result in Mr. Zhinin being released in his early sixties, only years away from his life expectancy, assuming that he had even been paroled by that point from his 20-40 year state sentence. (App. 160-61).

G.    Dr. Dattilio's report

As set forth in his report, Dr. Dattilio administered ten different psychological tests to Mr. Zhinin, several of which are "commonly used when assessing sex offenders and child predators." (App. 143, 156). One of these was the "Hare Psychotherapy Checklist Revised (Hare PCL-R)(2nd Ed.)" which "provides a dimensional score that represents the extent to which a given individual is judged to match the 'prototypical psychopath.'" (App. 156). Mr.

13

Zhinin's "very low" score of "eight" on this test "places him in the very low percentile" and "suggests that he is not a likely candidate to engage in future sex offenses." (App. 156).

Similarly, Mr. Zhinin's "results [on] the Sexually Violent Risk-20 Coding Sheet (SVR-20) indicate that [Mr. Zhinin] lacks any major mental illness or psychopathic deviance that would raise concern." (App. 156). To the same effect was the result of the "Aggression Questionnaire (AQ) which also indicates that there is a very low propensity for any expressed aggression, particularly on a physical basis." (App. 156).

Dr. Dattilio did find that Mr. Zhinin's "personality profile suggests that he does have a significant personality dysfunction which creates difficult interpersonal relationships and unrealistic expectations for himself." (App. 154-55). But, as Dr. Dattilio explained, this "diagnostic profile does not indicate that he has the type of personality disorder that is commensurate with the ingrained patterns that are typically seen with predators or sex offenders." (App. 156).[8]

---

[8] Dr. Dattilio also reviewed the evidence in the case including the on-line communications between Mr. Zhinin and the minor and the video that Mr. Zhinin made of their second encounter. As Dr. Dattilio observed, the minor appeared in the video to be more of an "older adolescent," and could even be mistaken for a "young adult," though there were also "many features with her demeanor and mannerisms that suggested that she was immature and inexperienced." (App. 156-57). As he also observed, Mr. Zhinin was not "forceful" with the minor and there was no "indication that [she] was in any type of pain or was resistant or complaining . . . ." (App. 156).

14

Dr. Dattilio reported that Mr. Zhinin "expressed his remorse and disgust for his behaviors and is amenable to treatment." (App. 157). In conclusion, Dr. Dattilio expressed his opinion that "Mr. Zhinin is at a very low risk to reoffend . . . ." (*Id*.).

H.    <u>The government's response and Mr. Zhinin's reply</u>

The government did not contest Mr. Zhinin's unwarranted disparity argument, nor the cases that defense counsel had pointed to. Notably, the government did not present any examples of a similarly situated defendant being sentenced to a life term of imprisonment. Nevertheless, the government advocated for a life sentence.

In so arguing, the government submitted that the court should completely disregard Dr. Dattilio's report, because Mr. Zhinin, during his interview with Dr. Dattilio, which occurred prior to his decision to plead guilty, claimed not to know that the minor was under eighteen. (App. 41). But, as Mr. Zhinin's counsel pointed out in her supplemental sentencing memorandum, Dr. Dattilio did not base his opinions simply on the representations of Mr. Zhinin, but rather upon his review of the entire evidence in the case and the extensive testing that he administered to Mr. Zhinin. (App. 161). Indeed, notwithstanding Mr. Zhinin's assertions, Dr. Dattilio opined that there were "many features" with the minor's

"demeanor and mannerisms" that should have revealed to Mr. Zhinin that she was "immature and inexperienced." (App. 157).

I.    The sentencing hearing

At the sentencing hearing, the parties reiterated the arguments that they had made in their memorandums. The government again did not contest Mr. Zhinin's unwarranted disparity argument. Instead, the government presented testimony from the minor and her mother regarding the psychological harm that the minor has suffered as a result of the offenses of conviction, specifically, the fear, anxiety and depression that she has experienced. (App. 82-87).

The court also heard testimony from Mr. Zhinin's family, specifically his mother, father and three younger siblings. They all testified to his being an exceptional son and older brother and to their willingness to stand by him and emotionally support him through his many years of incarceration to come. (App. 67-80).

After hearing from the attorneys and the witnesses, the district court heard from Mr. Zhinin himself. He began by apologizing, by saying that he is "sorry for what [he has] done and the anguish that it's caused the victim and her family." (App. 110). Continuing in that vein, he stated:

> I'd also like to say that I'm sorry to my friends and to my family for all the pain and the hurt that I've caused them.
>
> Everyday, I consider what I've done and the people I've

16

hurt.  The actions – the actions are and will be a rightful burden on me for the rest of my life, even though I – I'll express the remorse for what I've done, it will only be a little bit of – a small amount, I'm truly sorry for what I have – a part of myself – for everyone, I've hurt and I'm sincerely sorry.

For my actions, I take full responsibility.  And along with the guilty plea, I hope it may bring some solace to the people I've hurt.

I also understand the other responsibilities that I would have to be part of, one of them would be to improve myself and to never do something like this again.

I will now work towards – for the benefit of the people I've hurt, my family and society.

I will not falter in my effort to do all I can to once again be an upstanding citizen.  At a minimum, I will be sixty-five in the area –around the time that I've been alive – even at such a prodigious an amount of time, a thirty-year term will still allow me and my family to be together, to be part of holidays and have dinners, to get to know each other again in the only way we can while being in prison and not through correspondence, phone calls and frequent visits.

I'm losing so much time with my family, I will not share watching my nieces and nephews grow up or be a part of my siblings' life as they progress as they have family of their own.

There is also the realization, that my mother and father might not be alive when I am released and that is something that is beyond me.

Your Honor, I implore you to please allow me to – the opportunity to be part of my family once again, to prove myself to be a contributing members of society.

There is nothing in this world that would ever be worth hurting

17

people like this again, hurting my family.

\* \* \*

I do promise, I will do better, I will be a better person and I'll
make them proud of me once again.  To my family, I love you
and I miss you guys very much.

(App. 110-112).

J.    <u>The district court's sentencing explanation</u>

The district court began its sentencing explanation by stating that it had
reviewed the exhibits, including Dr. Dattilio's report which it "considered . . .
carefully."  (App. 113).  The court, however, did not go on to address any of the
contents of the report and the court made no further mention either of it or Dr.
Dattilio during the rest of the proceeding.

Similarly, the court referred to the chart of other cases that defense counsel
had submitted and to defense counsel's argument concerning unwarranted
sentencing disparity, an argument that the court characterized as "very powerful."
(App. 113).   But while the court acknowledged that "many of these other cases
appear to be similar or in fact much more serious," (*Id*.), the court did not
specifically address any of them and the court never found that a sentence of life
imprisonment in this case would not create unwarranted sentencing disparity.
Indeed, beyond initially acknowledging counsel's argument, the court never
referred to the factor of unwarranted disparity again.

The district court also acknowledged counsel's argument regarding Mr.

Zhinin's life expectancy, another "very strong argument," agreeing that "even with

a sentence of thirty-years, [Mr. Zhinin] would be very close to his expected life

expectancy." (App. 114-15). And the court also specifically found Mr. Zhinin's

expression of remorse to be "legitimate," concluding that Mr. Zhinin "has

repeatedly demonstrated remorse and has repeatedly accepted responsibility."

(App. 114-15).

Nevertheless, despite these various acknowledgments, the district court still

imposed a life sentence. In so doing, the court focused upon the seriousness of the

offense and the need for deterrence, but primarily driving the court's sentence was

the court's belief, repeatedly expressed, that the instant offenses were caused by an

"evilness" that "lurks within" Mr. Zhinin, that this evilness is "unmitigable," and

that, as such, Mr. Zhinin would "be likely to commit another offense, if [he was]

released from jail," no matter how old he might be at that point:

> This is not a mistake and this is not simply misconduct, it is
> – as I said – this is evilness. There is an evilness that lurks
> within you, sir, it's an evilness that you could not control.
> And you could not control it the first time, you did this, you
> could not control it, the second time you did this and you
> could not control it, the third time you attempted to do it.
> Yet everything else about your life belies this evilness –
> everything.
>
> * * *
>
> Sir, after considering all of that and all of the factors set

19

forth in Section 3553(a), both the positive as well as the
negative and after considering the fact that I do believe
there is an unmitigable evilness within you and that you
are likely to commit another offense, if you are released
from jail and recognizing that you only have one life, I
do find that you are a deviant, sexual predator and that
you do pose a danger to the community and will continue
to pose a danger to the community.  And accordingly, sir,
I am going to sentence you to life imprisonment.

(App. 118, 120).[9]

K.    Defense counsel's objection

Following the court's pronouncement of sentence, Mr. Zhinin's attorney

objected to the court's explanation of sentence, an objection which the district

court duly noted:

> Ms. Maceoin:    Yes, your Honor, we have two – ah – things
> of note.
>
> First of all, under the United States versus
> Laura Medea (ph),[10] we are lodging an objection
> to this Court's imposition of the sentence and
> argue that it has not considered the arguments
> of defense counsel, both in the pleadings and
> here in court today.
>
> The Court:    Very well.  Thank you, Counselor.

(App. 125).

---

[9] The court's complete sentencing explanation is set forth at App. 112-120.

[10] The case counsel was referring to is *United States v. Flores-Mejia*, 759 F.3d
253 (3d Cir. 2014).

20

## SUMMARY OF THE ARGUMENT

### I

The district court committed three procedural errors in sentencing Mr. Zhinin, a first-time offender, to a life term of imprisonment.  First, while the court acknowledged Mr. Zhinin's unwarranted disparity argument as being "very powerful," and that the other defendants pointed to by Mr. Zhinin had committed "similar or in fact, much more serious offenses," (App. 113), the court never actually responded to this argument and never found that Mr. Zhinin's life sentence did not create unwarranted sentencing disparity.  The district court thus violated this Court's "concrete requirement" that the district court "acknowledge *and respond* to any properly presented sentencing argument."  *United States v. Ausburn*, 502 F.3d 312, 328 (3d Cir. 2007) (emphasis added).

The mere fact, moreover, that the district court addressed other statutory sentencing factors, such as the seriousness of the offense and the need for deterrence, does not diminish the court's failure to actually respond to Mr. Zhinin's unwarranted disparity argument.  *United States v. Begin*, 696 F.3d 405, 414 (3d Cir. 2012) ("[W]e have held that 'a district court's failure to analyze § 3553(a)(6) [the unwarranted disparity factor] may constitute reversible procedural error, even where . . . the court engages in thorough analysis of several

21

other sentencing factors.'") (quoting *United States v. Merced*, 603 F.3d 203, 224 (3d Cir. 2010)).

Second, the district court similarly erred by never actually responding to Dr. Dattilio's report. While Dr. Dattilio, based on extensive psychological testing, opined that Mr. Zhinin is not a sociopath, is amenable to treatment and has a low likelihood of reoffending, the district court, without addressing any of those findings, concluded that Mr. Zhinin is possessed by "umitigible evil" and would therefore be "likely" to commit new crimes if he was ever released from prison, regardless of how old he might be at that point. (App. 120). The court's failure to explain why it apparently rejected Dr. Dattilio's opinion, in favor of its own assessment of "evil" and Mr. Zhinin's likelihood of recidivism, is further procedural error. *See United States v. Olhovsky*, 562 F.3d 530, 547-48 (3d Cir. 2009) (holding that district court committed procedural error where "the court never explained why it rejected Dr. Silverman's assessment of the likelihood of recidivism" and instead concluded that the defendant "'could turn around and become again a predator – a pedophile monster.'").

Finally, the court's reliance on its belief that Mr. Zhinin is possessed by "unmitigable evil," and its speculation from that belief that Mr. Zhinin would "likely" commit crimes should he ever be released from prison, no matter how

22

advanced his age, was blatantly improper.  This Court and others have repeatedly

reversed sentences based upon such speculative notions of recidivism.  *See*

*Olhovsky*, 562 F.3d at 547-48 (reversing where district court speculated that

defendant might become a "pedophile monster"); *United States v. Cossey*, 632

F.3d 82, 87 (2d Cir. 2010) (remanding for resentencing where district court, in

imposing a Guidelines sentence, expressed its view that defendant would likely

continue to look at child pornography because of a "gene" inside of him which

science had yet to discover.)

## II

The district court's sentence of life imprisonment is also substantively

unreasonable.  No "reasonable sentencing court would have imposed [this] . . .

sentence on [this] particular defendant for the reasons the district court provided."

*United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (*en banc*).  As set forth

above, and further below, the district court's primary rationale for the sentence –

that Mr. Zhinin, a first time offender, is possessed by "unmitigable evil," which

would cause him to commit new crimes if he was ever to be released from prison,

regardless of his age – was patently improper.  Accordingly, because no reasonable

sentencing court would sentence Mr. Zhinin to life imprisonment on this basis, the

case should be remanded for resentencing, and given the nature of the judge's

remarks the case should be reassigned to a different judge.  *See Cossey*, 632 F.3d at

89 (remanding to a different judge where the "the extent of the discussion concerning Cossey's genetic predisposition to re-offend has raised serious concerns over the objectivity of the judge in resentencing Cossey.").

# **ARGUMENT**

## **I.**

**Whether the district court judge committed procedural error in sentencing Mr. Zhinin, a first time offender, to a life term of imprisonment where the judge:**

> **1) acknowledged Mr. Zhinin's unwarranted disparity argument as being "very powerful," but failed to actually then respond to it, or to find that Mr. Zhinin's life sentence did not create unwarranted disparity with the thirty other defendants defense counsel specifically pointed to;**

> **2) acknowledged, but failed to respond to the report and testing of the forensic psychologist who evaluated Mr. Zhinin and concluded that he is not a sociopath, is "amenable to treatment," and is "at a very low risk to reoffend;" and**

> **3) explained his imposition of a life sentence by stating his personal belief that "there is an evilness which lurks within [Mr. Zhinin] . . . . an unmitigable evilness" that would make Mr. Zhinin "likely to commit another offense" should he ever be released from prison, no matter how advanced his age?**

### Standard of Review

Criminal sentences are reviewed for reasonableness, generally an abuse-of-discretion standard.  Sentencing procedures are reviewed *de novo* when objected to below, and for plain error otherwise.  *See United States v. Flores-Mejia*, 759 F.3d 253, 256-57 (3d Cir. 2014) (*en banc*).  Here, the district court's failure to meaningfully consider Mr. Zhinin's arguments in mitigation was objected to and is therefore reviewed de novo.  Not objected to, however, was the impropriety of the district court sentencing Mr. Zhinin based upon the

25

court's personal view that he is possessed by "unmitigable evil," and the court's

speculation that Mr. Zhinin would therefore be likely to commit crimes even in

his old age.  Accordingly, this aspect of the issue is reviewed for plain error.

<u>Discussion</u>

The fundamental issue in this case was how severely Mr. Zhinin should be

punished.  The government sought the most severe sentence possible, life

imprisonment, despite the fact that Mr. Zhinin was a first-time offender and the

instant offenses, reprehensible as they were, did not involve force or violence.[11]

Mr. Zhinin's attorney, by contrast, argued for a thirty-year sentence, an extremely

severe sentence for a first-time offender, but the mandatory minimum that the

district court could render.  In support of a thirty-year sentence, defense counsel

---

[11] While life imprisonment was the advisory Guidelines sentence, this Court, like many others, has recognized that the child pornography Guideline "'is fundamentally different' from other Guidelines and, unless it is 'applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires.'" *United States v. Grober*, 624 F.3d 592, 607 (3d Cir. 2010) (quoting *United States v. Dorvee*, 604 F.3d 174, 184-86 (2d Cir. 2010)).  Accordingly, a substantial majority of child pornography defendants are sentenced below the advisory Guidelines range.  U.S. Sentencing Comm'n, 2018 Sourcebook of Federal Sentencing Statistics at 90.  The extreme "irrationality" of the child pornography Guidelines, *Dorvee*, 616 F.3d at 187, is illustrated here by the fact that the advisory range for the criminal conduct at the heart of this case, sexual intercourse with a minor, was 292-365 months.  The range was only elevated to life imprisonment under the child pornography Guideline because of the recording that Mr. Zhinin made of the encounter.  While this recording, which was never disseminated, was itself reprehensible and may have warranted some additional incremental punishment, it would hardly seem to warrant the extreme escalation of the advisory sentencing range to life imprisonment.

pointed to the statutory sentencing factor of avoiding unwarranted sentencing disparity and to scores of other cases where defendants had committed similar or more severe crimes and had not been sentenced to life.  Counsel also submitted a report of a forensic psychologist who opined that Mr. Zhinin is not a sociopath, that he is "amenable to treatment," and that he is a "low risk to re-offend."  (App. 157).  And, as counsel also pointed out, a thirty-year sentence would mean that Mr. Zhinin would not be released until near the end of his life expectancy, a time when his likelihood of re-offending would be especially low.

Despite these arguments, the district court elected to impose a life sentence. In so doing, the court committed multiple procedural errors.  First, the court acknowledged defense counsel's unwarranted disparity argument as being "very powerful," (App. 113), but never went on to respond to it.  As such, the court never found that Mr. Zhinin's life sentence did not create unwarranted disparity with all of the other cases that counsel had pointed to, cases which the district court acknowledged to have involved offenses similar to or more severe than Mr. Zhinin's.  Accordingly, the district court violated this Court's "concrete requirement" for sentencing proceedings, that the district court "acknowledge *and respond* to any properly presented sentencing argument which has colorable legal merit and a factual basis."  *United States v. Ausburn*, 502 F.3d 312, 328 (3d Cir. 2007) (emphasis added).

27

Similarly, the district court acknowledged Dr. Dattilio's report by stating that it had been carefully considered, but the court again never actually responded to it. The court thus failed to explain why it rejected Dr. Dattilio's opinion that Mr. Zhinin is not a sociopath and has a low risk of re-offending, in favor of its own opinion that Mr. Zhinin is possessed by "unmitigable evil" and will therefore always be "likely" to commit further crimes, even near the end of his life. (App. 120). Thus, here too, the district court violated this Court's requirement that non-frivolous arguments not only be acknowledged, but actually responded to.

Finally, it was patently improper for the district court to impose a life sentence based upon its personal view that unmitigable evil "lurks within" Mr. Zhinin, such that even in the final years of his life, Mr. Zhinin, a first time offender, would be likely to commit further crimes. (App. 118, 120). As discussed further below, this Court and others have repeatedly reversed sentences that have been based on such speculative notions of recidivism. *See e.g.*, *United States v. Olhovksy*, 562 F.3d 530, 547-48 (3d Cir. 2009) (remanding for resentence, where district court rejected the opinions of the defense experts and expressed its own view that defendant could become a "pedophile monster."); *United States v. Cossey*, 632 F.3d 82, 87 (2d Cir. 2010) (remanding for resentencing where district court, in imposing a Guidelines sentence, expressed its view that defendant would

28

likely continue to look at child pornography because of a "gene" inside of him that science had yet to discover.)

Accordingly, for all these reasons, this case should be remanded for resentencing.

### A.    At sentencing, the district court must articulate on the record an acknowledgement and response to the parties' arguments.

This Court's primary concern when it reviews criminal sentences is to "ensur[e] that district courts follow proper sentencing procedures." *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010). Proper sentencing procedure in this Circuit involves three steps, the first two of which – calculating the Guidelines range and ruling on departure motions – are not at issue. The third step, however, is. That step requires the district court to exercise its discretion by considering the sentencing factors set forth in 18 U.S.C. § 3553(a) and selecting an appropriate sentence "regardless whether it varies from the sentence calculated under the Guidelines." *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).[12]

A "concrete requirement" of this third step is that the district court "must acknowledge *and respond* to any properly presented sentencing argument" from the parties "which has colorable legal merit and a factual basis." *Ausburn*, 502

---

[12] The sentencing factors set forth in 18 U.S.C. § 3553(a) include the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

F.3d at 328-29 (italics added) (citing *Rita v. United States*, 551 U.S. 338, 356 (2007)).  As the Supreme Court put it in *Rita*, "[w]here the defendants or prosecutor presents non-frivolous reasons for imposing a different sentence," the sentencing judge should "explain why he has rejected those arguments."  551 U.S. at 356-57; *see also United States v. Friedman*, 658 F.3d 342, 362 (3d Cir. 2011) ("where one party raises a colorable argument about the applicability of one of the [3553] factors, [ ] the court should respond to that argument as part of its 'meaningful consideration' of the relevant statutory factors and the exercise of independent judgment.") (quoting *United States v. Merced*, 603 F.3d 203, 221 (3d Cir. 2010)).

By "articulating reasons" on the record for accepting or rejecting the parties' arguments, *Rita* explained, "[t]he sentencing judge ... satisf[ies] the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."  *Id*.  This articulation of reasons is a necessary prerequisite to more deferential substantive review of the sentence on appeal.  *See United States v. Begin*, 696 F.3d 405, 411 (3d Cir. 2012).  It also "helps provide the public with the assurance ... that the sentencing process is a reasoned process."  *Rita*, 551 U.S. at 356-57; *see also Merced*, 603 F.3d at 225.

The sentencing court's acknowledgment and response to the parties' arguments must reflect "meaningful consideration," *Flores-Mejia*, 759 F.3d at 256,

clear and specific enough for this Court to exercise effective review of its decision on appeal. The record must contain "an explanation from the district court sufficient for us to see that the particular circumstances of the case have been given meaningful consideration." *United States v. Levinson*, 543 F.3d 190, 196 (3d Cir. 2008) (emphasis added).

This Court will not "fill in the gaps" of an inadequate sentencing explanation, but instead will vacate and remand for resentencing. *Ausburn*, 502 F.3d at 331. When vacating a sentence due to the district court's failure to acknowledge and respond to one of the defendant's arguments, the Court noted that "[t]he District Court may have had in mind reasons" for rejecting the argument, "but it did not articulate those reasons." *Id*.; see also *United States v. Jackson*, 467 F.3d 834, 842 (3d Cir. 2006) ("What matters is that the Court specifically addressed [the defendant's] non-frivolous arguments and that it did so in a way that allows us to review the sentence for reasonableness."); *Levinson*, 543 F.3d at 195-97 (explaining why "explanation" is "key to appellate review").

This Court has thus repeatedly vacated and remanded sentences when the district court erred by failing to acknowledge and respond to the parties' arguments, and several of these cases have specifically concerned arguments related to unwarranted sentencing disparities. *See Ausburn*, 502 F.3d at 330 (holding that  the district court's sentencing explanation "is inadequate to

demonstrate that the District Court gave meaningful consideration to counsel's arguments about an unwarranted disparity between the Ausburn and Kenrick sentences"); *Friedman*, 658 F.3d at 363 (remanding for resentencing where the "District Court did not . . . address whether comparing Friedman's sentence to Lam's sentence or Zanardelli's sentence demonstrated a sentencing disparity."); *Merced*, 603 F.3d 203 at 224. ("Nothing in the record, however, indicates that the District Court considered § 3553(a)(6) at all, despite the government's emphasis on that argument in its sentencing memorandum and the risk of disparities that Merced's sentence undoubtedly created."); *Begin*, 696 F.3d at 414 ("Having concluded that Begin's federal - federal disparity argument has colorable legal merit under § 3553(a)(6), we agree with him that District Court failed to make a sufficient record to demonstrate its consideration of that argument."); *United States v. Lychock*, 578 F.3d 214, 219 (3d Cir. 2009) ("Indeed, the District Court did not even mention [the unwarranted disparities] factor despite the fact that, in its sentencing memorandum, the government explicitly invoked this factor and highlighted the within-Guidelines sentences several RegPay defendants had already received from other judges of the District Court.); *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("The court also said nothing of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, as required by § 3553(a)(6)").

**B.     Sentencing determinations must be based on reliable evidence – unsupported speculation regarding recidivism is impermissible**

As courts have long recognized, "'due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.'" *United States v. Bradley*, 628 F.3d 394 (7th Cir. 2010) (quoting *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009). Accordingly, this Court and others have closely scrutinized sentences based on speculative opinions about a defendant's risk of recidivism. *See Olhovsky*, 562 F.3d at 547-48 (remanding for resentencing where district court based its sentence, in part, on its fear, contrary to the opinions of the defense experts, that the defendant could become a "pedophile monster."); *United States v. Zabielski*, 711 F.3d 381, 390-91 (3d Cir. 2013) (reviewing cases involving "child pornography and sexual conduct with minors" in which courts' heavy reliance on "beliefs about recidivism" had resulted in procedural error); *United States v. Cossey*, 632 F.3d 82, 87 (2d Cir. 2012) ("While a defendant's propensity to re-offend is a proper consideration under § 3552(a)(2)(C), the court below relied on this single factor, which it linked to its unsupported belief that Cossey was prevented from controlling his behavior due to a genetic inability to do so."); *United States v. Griess*, 971 F.2d 1368, 1373 (6th Cir. 1992) (remanding for resentencing where district court based sentence, in part, on its "unsubstantiated" view that defendant was "obviously incorrigible,"

where defendant "only had one adult conviction and several juvenile convictions before his present offenses.").

### C. The district court failed to acknowledge and respond to Mr. Zhinin's non-frivolous sentencing arguments

i) The unwarranted disparity argument

Mr. Zhinin raised a more than colorable sentencing argument that the imposition of a life sentence would create unwarranted sentencing disparity.[13]  In support of this argument, defense counsel submitted a chart of thirty cases from the Eastern District of Pennsylvania in which defendants had committed offenses comparable or more severe than Mr. Zhinin's and received sentences of less than life.  And, none of these defendants had a more favorable prior record than Mr. Zhinin, who had no prior contacts with the criminal justice system.  The district court acknowledged Mr. Zhinin's unwarranted disparity argument as being "very powerful," and the court further acknowledged that "many of the[ ] other cases" pointed to by Mr. Zhinin's counsel do "appear to be similar or in fact much more serious."  (App. 113).  But, the court's analysis of the unwarranted disparity issue ended with this initial acknowledgment.  The court never went on to actually

---

[13] As noted above, the sentencing factors set forth in 18 U.S.C. § 3553(a), which the district courts are required to consider, include the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C § 3553(a)(6).

respond to the argument.  Indeed, after the court began its sentencing remarks with this acknowledgment, the court never again even mentioned the unwarranted disparity factor.  Thus, the court never found that Mr. Zhinin's life sentence did not create an unwarranted disparity with all of the other cases pointed to by defense counsel.

As discussed above, this Court has repeatedly vacated sentences and remanded for resentencing in cases such as this where a party's non-frivolous sentencing argument has not been responded to, and this Court has repeatedly done so in cases involving unwarranted sentencing disparity.

*United States v. Ausburn* provides a perfect illustration.  The defendant there was a police detective who engaged in a sexual relationship with a fourteen-year old whom he met when responding to a police matter.  502 F.3d at 315. He pled guilty to utilizing a telephone and a computer to induce a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b).  *Id*. at 316.  The district court then sentenced the defendant to a prison term of 144 months for conduct not very dissimilar to Mr. Zhinin's.  *Id*. at 321.[14]  In seeking a lower sentence, Ausburn had pointed to two other cases from the same district, one involving the same judge. *Id*. at 317-18.  But, the district court, in explaining its sentence, did not directly

---

[14] Given the vagaries and peculiarities of the Sentencing Guidelines that apply to sex offenses and child pornography cases, the Guideline range in *Ausburn* was only 57-81 months.  *Id*. at 317.

respond to those two cases, though the court did state that it had considered the need to avoid unwarranted sentencing disparities. *Id*. at 321. Immediately following the court's imposition of sentence, the defendant's counsel objected to the court's imposition of a sentence above the Guidelines range and in making that objection, counsel again made reference to the other case in which the judge had imposed a lower sentence. *Id*. Responding to the objection, the court, as it had done previously, cited the seriousness of the offense and the defendant's serious violation of trust, the latter of which, as the court noted, had also been addressed by the Guidelines. *Id*.

On appeal, this Court found that the district court had failed to give "meaningful consideration" to the defendant's unwarranted disparity argument. *Id*. at 330. This Court found insufficient the district court's mere statement that it had "considered the need to avoid unwarranted sentencing disparities among the defendants with similar records who found themselves guilty of similar conduct." *Id*. at 321. Also inadequate was the district court's specific response to defense counsel's post-sentence objection. While the district court referred to Ausburn's violation of trust as a police officer, which, as this Court recognized, arguably made Ausburn different from the defendant in the other case, the district court did not actually refer to the other case so as to make that point. *Id*. at 330. Remanding the case for resentencing, this Court held that to the extent the district court's

"comment may be thought responsive to counsel's objection, it is inadequate to demonstrate that the District court gave meaningful consideration to counsel's arguments . . . ." *Id*. This Court stated that "[w]here the record is inadequate we do not fill in the gaps by searching the record for factors justifying the sentence." *Id*. at 331.

Here the record is, if anything, significantly more inadequate than in *Ausburn*. The district court here, unlike the district court in *Ausburn*, did not even claim that, in imposing a life sentence, it had avoided the creation of an unwarranted disparity. To the contrary, the court actually acknowledged that Mr. Zhinin had presented a "very powerful" unwarranted disparity argument, but the court then never responded to that argument or addressed any of the thirty cases that counsel had pointed to, beyond also acknowledging that those cases did "appear to be similar or in fact, much more serious and they did not result in life sentences." (App. 113). Thus, unlike *Ausburn*, there is not even a response here for this court to attempt to parse for "meaningful consideration." The district court simply acknowledged the argument and then completely abandoned the issue.

What *Ausburn*, and several other cases of this Court, also makes clear is that the fact that the district court here addressed other statutory sentencing factors and provided reasons for Mr. Zhinin's life sentence, does not diminish the district court's failure to consider Mr. Zhinin's argument regarding the factor of

37

unwarranted sentencing disparity.  The district court in *Ausburn* explained its sentence by stating that it had "considered . . . the nature and circumstances of the offense," which it "f[ound] to be particularly troubling," and the "defendant's history and characteristics."  *Id*. at 321.  Nevertheless, the district court's failure to meaningfully respond to the disparity argument required resentencing.

This point was also made explicit in *United States v. Begin*, another case in which this Court remanded for resentencing because of the district court's failure to address the defendant's disparity agreement.  696 F.3d at 414.  As this Court explained, "we have held that 'a district court's failure to analyze § 3553(a)(6) may constitute reversible error, even where . . . the court engages in thorough and thoughtful analysis of several other sentencing factors.'"  (quoting *United States v. Merced*, 603 F.3d 203, 224 (3d Cir. 2010)).  "In other words, meaningful consideration of the nature of the offense, the characteristics of the defendant, the need to protect the public, the need to promote deterrence, etc., may not save a sentence if the sentence is imposed without considering the risk of creating unwarranted disparities, and the sentence in fact creates such a risk."  *Merced*, 603 F.3d at 224.

Accordingly, the district court's failure to respond to Mr. Zhinin's unwarranted disparity argument requires resentencing.

ii) The court's failure to address Dr. Dattilio's report

Mr. Zhinin's counsel also made a non-frivolous argument for a lower sentence on the basis of Dr. Dattilio's report. As counsel pointed out to the court, Dr. Dattilio, based on his extensive testing of Mr. Zhinin, concluded that Mr. Zhinin is not a sociopath, that he is "amenable to treatment" and that he is "at a low risk to reoffend." (App. 113; 156-57).[15] As with the unwarranted disparity issue, the district court acknowledged Dr. Dattilio's report by stating that it had been "considered . . . carefully," (App. 113), but the court never actually responded to it. Instead, after this cursory acknowledgement, the court never mentioned it or Dr. Dattilio again. The court thus never explained why it apparently rejected Dr. Dattilio's opinions and instead adopted its own view that Mr. Zhinin is possessed by an "unmitigable evil," and that, as such, Mr. Zhinin would be "likely" to commit further crimes if he was ever released from jail, no matter how old he might be at that point. (App. 120). The court thus again violated this Court's "acknowledge and respond" requirement. As this Court has recognized, it is plainly not sufficient for a district court to merely state that a defendant's arguments have been "considered." *United States v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006).

---

[15] *See supra* at 13-15 for further discussion of Dr. Dattilio's report and his testing of Mr. Zhinin.

This Court's decision in *Olhovsky* is especially on point. The defendant there was convicted of possessing child pornography. 562 F.3d at 532. The defense submitted a letter from a psychologist who had been treating the defendant for over a year, stating that the defendant had made significant progress and that "while I cannot represent that Mr. Olhovsky will never behave inappropriately in the future . . . I do not view him as being a fixated pedophile or lacking desire in being with age-appropriate consenting females." *Id*. at 535. The defense also presented a report from a second psychologist, who after testing the defendant, reported that the defendant "presents as within the limits of risk appropriate for outpatient management." *Id*. at 540. A similar report was submitted from a third psychologist. *Id*. at 539-40. On the basis of this evidence, the defendant requested a sentence of probation. *Id*.

In response, the government submitted a report of its own mental health expert, who noted his "serious concerns regarding [the defendant's] predilection for child pornography and propensity for future involvement in either procuring, distributing, and/or collecting child pornographic materials." *Id*. at 541. The government thus argued for a Guidelines sentence of 120 months.

The district court varied downward, but not nearly as far as the defendant was requesting. The court imposed a sentence of six years. *Id*. at 541. In so doing, the court expressed its view that the "psychologists don't know what [the

40

defendant's] going to do . . . [the defendant] has indicated pedophile proclivities in the past and they can't tell me whether or not he will be a pedophile in the future." *Id*. at 542. Continuing in this vein, the court stated that the defendant "might stand some chance, but, you know something, he might also turn around and become again a predator – a pedophile monster, and this Court is not prepared to impose any sentence which, one, denigrates the significance of the conduct which [defendant] has done, suggest that this does not warrant substantial, indeed, potentially draconian punishment and, three, make sure that if he gets treatment, that it's in an environment where indeed it can be ensured that treatment is under close custody .. . ." *Id*.

On appeal, this Court reversed.  As this Court recognized, the district court failed in its sentencing explanation to respond to the reports of the defense experts and to explain why it was rejecting their assessments of the likelihood of recidivism:

> Here, it is not at all apparent that the court actually considered the lengthy, very specific and highly positive reports of any of the three defense experts.  Rather, the court focused on incapacitation, deterrence and punishment to the exclusion of other sentencing factors.  The court's suggestion that Olhovsky "could turn around and become again a predator — a pedophile monster," and its statement that a sentence must not "denigrate, the significance of the conduct . . . [or suggest that Olhovsky] does not warrant substantial, indeed, potentially draconian punishment . . . " can not be interpreted in any other way.

41

*Id.* at 547; *see also id.* at 548 ("[The court never explained why it rejected Dr. Silverman's assessment of the likelihood of recidivism.").

Here, again, the district court did significantly less than what this Court has previously found to be inadequate. Whereas in *Olhovsky*, the district court's sentencing explanation at least made some response to the parties' competing experts – "as the psychologists have admitted, they don't know what he's going to do . . . they can't tell me whether or not he will be a pedophile in the future" – the district court here offered no response whatsoever to Dr. Dattilio's report, beyond the court's bare reference to it having been considered. Thus, even more than in *Olhovsky*, the court "never explained why it rejected [the defense] expert's assessment of the likelihood of recidivism." *Id.* at 548; *see also Cossey*, 612 F.3d at 88 (remanding for resentencing and recognizing that "a court is free, in its discretion, to decline to rely on the psychologist's findings, so long as the court explains its basis for doing so.").

Accordingly, here as in *Olhovsky*, a remand for resentencing is required because of the district court's failure to respond to Dr. Dattilio's report.

## D. The district court's rationale for imposing a life sentence was improper

The problem here is not merely that the district court called Mr. Zhinin "evil." The issue is not semantics or loose rhetoric. Rather, the problem is the multiple levels of conjecture that the district court engaged in regarding Mr. Zhinin's supposed "evilness," and how the court's beliefs in that regard led the

court to speculate about Mr. Zhinin's likelihood of recidivism some thirty years into the future. First, the court postulated that this evil is something that Mr. Zhinin is actually possessed by, that it "lurks within him." (App. 118). Next, the court theorized that the evil is beyond any possible treatment, that it is an "unmitigable evil." (App. 120). And, finally, based on the belief that the evil is "unmitigable," the court speculated that if Mr. Zhinin was to be released from jail after serving a thirty-year mandatory minimum sentence, as his attorney was advocating for, he would still, even at that advanced stage of his life, be "likely" to commit further crimes. (App. 120). This was the reasoning that led the district court to impose a life sentence and it is precisely the type of unbridled and unsubstantiated speculation regarding recidivism that this Court and others have rejected. *See Olhovksy*, 562 F.3d at 542 (remanding for resentencing where district court, contrary to the reports of the defense experts, speculated that the defendant could turn around and become a "pedophile monster").

In addition to *Olhovsky*, the Second Circuit's decision in *United States v. Cossey* is directly on point. The defendant there was sentenced within his Guidelines range to a sentence of seventy-eight months, following his conviction on several counts of possessing child pornography, offenses which he committed after previously being investigated by the FBI for that same offense years earlier. *Id.* at 85, 88. The district court, in imposing sentence, rejected "two separate

43

psychological evaluations that had found Cossey was at a low to moderate risk to re-offend." *Id*. at 87. The court instead expressed its belief that the defendant was at a high risk for reoffending because, in the court's view, the defendant's desire to view child pornography was the result of a "gene" he was born with, which science had yet to discover, and, as such, the defendant's therapy could "only lead . . . to a sincere effort . . . to control" the problem, but it "can't get rid of it." *Id*.

The Second Circuit reversed, and remanded the case to a different district court judge, holding that the district court's sentencing explanation was patently improper and constituted plain error:

> It is undisputed that it would be impermissible for the court to base its decision of recidivism on its unsupported theory of genetics. For Cossey's challenge to survive, there must be error and it must be plain. Where a district court relies on its own scientific theories of human nature to sentence a defendant, as it does here, a finding of plain error is warranted. The court's belief that Cossey was genetically incapable of controlling his urges affected the court's decision to sentence him to imprisonment, to impose a prison term that is lengthy, and to order him to submit to supervised release for life, all of which affect Cossey's substantial rights. Once plain error affecting substantial rights has been established, an appellate court may exercise its discretion to correct it if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Doe*, 297 F.3d at 82. It is uncontroversial to conclude that a sentencing decision that relies on factual findings that were unsupported in the record, and thus could not possibly have been established by a preponderance of the evidence, seriously affects the fairness, integrity, and public reputation of judicial proceedings.

*Id*. at 88.[16]

This exact same analysis applies here. Just as the district court in *Cossey* believed that the defendant there was "genetically incapable of controlling his urges," so too here the court believed that Mr. Zhinin would for the remainder of his life always be likely to commit crime because of the "unmitigable evil" that lurks within him. And, while it is unclear what the judge believed the source of Mr. Zhinin's "unmitigable evil" to be – moral, religious, genetic, or other – the problem remains exactly the same. Just as in *Cossey*, the court here relied upon its own unsupported theory of human nature, whatever the basis of that theory might be, to speculate about Mr. Zhinin's likelihood of recidivism many years into the future, speculation that was not only contrary to Dr. Dattilio's extensive testing and report, but to Mr. Zhinin's lack of any prior record, as well as the genuine remorse and acceptance of responsibility that the court itself found Mr. Zhinin to have repeatedly expressed. That the judge here was perhaps more vague about his beliefs than the judge in *Cossey* does not make the error any less substantial.

---

[16] The Second Circuit reached this conclusion though it recognized that there was evidence in the record that "would support the district court's decision that Cossey would re-offend based on an appropriate consideration that he did in fact re-offend at least once." *Id*. at 89. Nevertheless, given the district court's comments regarding the defendant's as yet undiscovered "gene," the Second Circuit remanded for resentencing with a different judge.

Accordingly, as in *Cossey*, this case should be remanded for resentencing.

And, as in *Cossey*, the remand should be to a different judge. The Second Circuit

did so in that case because the "extent of the discussion concerning Cossey's

genetic predisposition to re-offend has raised serious concerns over the objectivity

of the judge in resentencing Cossey." *Id*. at 89. Likewise, here, the district court's

repeated references to Mr. Zhinin's "evilness," and the court's belief that this evil

is "unmitigable," raises the same concerns as in *Cossey* regarding the court's

objectivity in resentencing Mr. Zhinin. The remand should thus, as in *Cossey*, be

to a different judge.

## II.

**Mr. Zhinin's sentence of life imprisonment is substantively unreasonable given that the court's primary basis for it – the court's unsubstantiated speculation that Mr. Zhinin, a first time offender, would still be a "likely" recidivist even after serving a thirty-year mandatory minimum sentence because of the "unmitigable evil" lurking within him – was improper and one which no reasonable sentencing court would adopt.**

Standard of Review

This Court has held that "if the district court's sentence is procedurally

sound, we will affirm it unless no reasonable sentencing court would have imposed

the same sentence on that particular defendant for the reasons the district court

provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).

However, this Court has made clear that its "adoption of a deferential standard of

46

review for substantive reasonableness was 'not an exercise in self-abnegation.'"
*United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) (quoting *Tomko*, 562
F.3d at 575).  Where, as in this case, a district court does not follow this Court's
procedural sentencing requirements, substantive review will be far more exacting.
*See United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007) (describing
substantively unreasonable sentence as 'the product of the District Court's
procedurally flawed approach.").

## Discussion

As this Court has repeatedly explained, "'procedural problems may lead to
substantive problems, so that there are times when a discussion of procedural error
will necessarily raise questions about the substantive reasonableness of a
sentence.'"  *Olhovsky*, 562 F.3d at 553 (quoting *United States v. Levinson*, 543
F.3d 190, 193 (3d Cir. 2008)); *see also United States v. Merced*, 603 F.3d 203, 215
(3d Cir. 2010) ("These procedural requirements exist to 'guide the [district court's]
exercise of discretion.' and failure to observe them may lead a court to impose a
substantively unreasonable sentence.") (quoting *Goff*, 501 F.3d at 256).  Thus, in
*Olhovsky*, this Court found that the district court's failure to adequately "evaluate
the quality of mitigating evidence presented to it" resulted in a sentence, seventy-
two months, that was unreasonably severe, despite the fact that the sentence was
"substantially below the Guideline range."  562 F.3d at 551-52.

Likewise in the instant case, the procedural infirmities of the sentencing proceeding have resulted in a sentence that is substantively unreasonable. No "reasonable sentencing court would have imposed [this] . . . sentence on [this] particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (*en banc*). As set forth above, the district court's primary rationale for the sentence – that Mr. Zhinin, a first time offender, is possessed by "unmitigable evil," which would cause him to commit new crimes if he was ever to be released from prison, regardless of his age – was patently improper. Accordingly, no reasonable sentencing court would sentence Mr. Zhinin to life imprisonment on this basis. The sentence is therefore substantively unreasonable. For the reasons discussed above, the case should be remanded to a different judge.

## **CONCLUSION**

For all the foregoing reasons, this case should be remanded to the district

court for resentencing to a different judge.

Respectfully submitted,


/s/ *Robert Epstein*
ROBERT EPSTEIN
Assistant Federal Defender

BRETT G. SWEITZER
Assistant Federal Defender
Chief of Appeals

LEIGH M. SKIPPER
Chief Federal Defender

49

## **CERTIFICATE OF BAR MEMBERSHIP**

It is hereby certified that Robert Epstein is a member of the bar of the Court of Appeals for the Third Circuit.


*/s/ Robert Epstein*
ROBERT EPSTEIN

DATED:  July 25, 2019

## <u>CERTIFICATION</u>

I, Robert Epstein, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that the electronic version of the attached brief was automatically scanned by Symantec Endpoint Protection, version 14.0, and found to contain no known viruses.  I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.


*/s/ Robert Epstein*
ROBERT EPSTEIN

DATED:   <u>July 25, 2019</u>

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Robert Epstein, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that appellant's reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as amended December 1, 2016, because this brief contains 10,316 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2010 for Windows 7 word count software in font size 14, type style Times New Roman.

/s/ *Robert Epstein*
ROBERT EPSTEIN

DATED:  July 25, 2019

## <u>CERTIFICATE OF SERVICE</u>

I, Robert Epstein, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have electronically filed the *Brief for Appellant* and served copies upon Filing User Sherri Stephan, Assistant United States Attorney, Chief of Appeals, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.


*/s/ Robert Epstein*
ROBERT EPSTEIN

DATED:  <u>July 25, 2019</u>